**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC, *on behalf of the Participants and Beneficiaries of the Thunderbird Mining Co. Pension Plan*, et al., | |
| Plaintiffs, | Civil Action No. 09-517 Judge Beryl A. Howell |
| v. | |
| PENSION BENEFIT GUARANTY CORPORATION, | |
| Defendant. | |

**MEMORANDUM OPINION**

In May 2003, the Thunderbird Mining Company ("Thunderbird") filed for bankruptcy, stopped production at its iron ore facility, and placed nearly 400 hourly employees on indefinite temporary layoff. In light of Thunderbird's troubled business prospects, the Pension Benefit Guaranty Company ("PBGC"), in accordance with its statutory mandate to insure and protect pension benefits, moved to terminate the pension plan that Thunderbird had established for its hourly workers and have the PBGC appointed as statutory trustee of the plan. Plaintiffs in this case are former Thunderbird employees represented through their union representative who challenge the PBGC's denial, as administrator of the Thunderbird pension plan, of certain benefits to which they claim they are entitled under the plan. Specifically, the plaintiffs challenge the PBGC's determination that the Thunderbird facility had not undergone a "permanent shutdown" prior to termination of the pension plan and contend that the PBGC's denial of "shutdown benefits" to the plaintiffs was erroneous. Pending before the Court are

cross-motions for summary judgment based on the administrative record.  As explained below, the PBGC's determination that a "permanent shutdown" had not occurred prior to the plan termination date was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Accordingly, the defendant's motion for summary judgment is granted and the plaintiffs' motion for summary judgment on liability is denied.

## I.      BACKGROUND

### A.  Regulatory Background

The PBGC is the federal agency created by the Employee Retirement Income Security Act of 1974 ("ERISA") to insure certain private sector pension plans.  29 U.S.C. § 1302.  It fulfills this responsibility by "(1) encouraging the continuation and maintenance of voluntary private pension plans for the benefit of their participants, (2) providing timely payments of benefits in the case of terminated pension plans, and (3) making the maximum use of its resources while at the same time maintaining premiums at the lowest levels consistent with its statutory responsibilities."  *Pension Benefit Guar. Corp. v. Republic Techs. Int'l, LLC*, 386 F.3d 659, 661 (6th Cir. 2004); 29 U.S.C. § 1302(a)(1)-(3).

Among its functions, the PBGC guarantees benefits, within limits, to participants of a covered plan when that plan terminates with insufficient assets to cover its benefit liabilities.  29 U.S.C. § 1322.  The agency may terminate a plan "involuntarily" when it determines that certain statutory criteria have been met, *e.g.*, that the pension plan will be unable to pay benefits when due, or that the agency's possible long-run loss with respect to the plan "may reasonably be expected to increase unreasonably if the plan is not terminated."  29 U.S.C. § 1342(a).  "ERISA provides for involuntary termination proceedings precisely so that PBGC can protect its own financial interests and 'avoid any unreasonable deterioration of the financial condition of the

plan or any unreasonable increase in the liability of the fund.'" *Republic Techs. Int'l, LLC*, 386 F.3d at 668 (quoting 29 U.S.C. § 1342(c)).

The PBGC initiates the termination process by issuing a notice to the plan administrator of the PBGC's determination that the plan should be terminated. 29 U.S.C. § 1342(c). If the plan administrator challenges this determination, the PBGC "may, upon notice to the plan administrator, apply to the appropriate United States district court for a decree adjudicating that the plan must be terminated." *Id.* When a plan is terminated involuntarily, the PBGC must also apply to the appropriate district court for the appointment of a trustee to administer the plan. 29 U.S.C. § 1342(b). ERISA permits the PBGC to serve as trustee to administer a plan in addition to its role as guarantor. *Id.* "The PBGC has applied to serve as trustee in every terminated plan, and courts typically grant its application." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009) (citing *Pineiro v. Pension Benefit Guar. Corp.*, 318 F. Supp. 2d 67, 72 (S.D.N.Y. 2003)).

"When serving as a statutory trustee, [the] PBGC wears two hats: one as guarantor of ERISA's insurance program and one as trustee." *Davis v. Pension Benefit Guar. Corp.*, No. 08-cv-1064, 2011 WL 4536888, at *1 (D.D.C. Sept. 30, 2011) (internal citation and quotation omitted). As a trustee, the agency is responsible for administering benefits under the plan. 29 U.S.C § 1342(d)(1)(B). The agency sends determination letters to plan participants who apply to the PBGC for benefits, and these decisions may be challenged before the PBGC Appeals Board. 29 C.F.R. §§ 4003.21, 4003.51. A decision by the Appeals Board constitutes the PBGC's final agency action, 29 C.F.R. § 4003.59(b), of which plan participants may seek judicial review. 29 U.S.C. § 1303(f).

### B.  Factual Background

#### 1.  The Thunderbird Pension Plan

Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied

Industrial, and Service Workers International Union ("USW") was for several decades the

exclusive bargaining representative for the hourly employees of the Thunderbird Mining

Company.  Pls.' Statement of Material Facts, ECF No. 52, ¶ 1 ("Pls.' SMF").  In 1999, the

plaintiff negotiated a pension agreement with Thunderbird under which Thunderbird sponsored

an employee pension plan covered by Title IV of ERISA (the "Plan"). Am. Compl., ECF No. 13,

¶ 1; Pls.' SMF ¶ 3.  The terms of the Plan provided for "shutdown pension benefits," which are

triggered when an employee's continuous service is broken due to the "permanent shutdown" of

the Thunderbird facility.[1]  Pls.' SMF ¶ 20. The Plan did not, however, specifically define

"permanent shutdown."  *Id.*

Located in Eleventh, Minnesota, Thunderbird employed approximately 400 hourly

employees and provided low-grade iron ore in the form of taconite pellets for steel production.

*Id.* ¶ 2.  The company was a wholly owned subsidiary of Eveleth Mines, LLC ("EVTAC"),[2]

which itself was jointly owned by three steel companies: Rouge Steel, AK Steel, and Stelco.  *Id.*

¶¶ 2, 5; Def.'s Statement of Material Facts, ECF No. 51, ¶¶ 10-11 ("Def.'s SMF").  These

companies not only owned EVTAC, but were also EVTAC's sole customers for taconite pellets.

Pls.' SMF ¶ 5, Def.'s SMF ¶ 11.

---

[1] According to the PBGC, a "shutdown benefit" is a "subsidized early retirement benefit that becomes payable when all or substantially all of an employer's operations at a facility cease, resulting in a loss of jobs that is expected to be permanent for all or substantially all of the employees at that facility who are participants in the plan." Administrative Record ("AR"), at 659.

[2] According to EVTAC's former chief executive officer, "[t]he Thunderbird Mining Company is merely an employment company which handles all employment costs, taxes and benefits.  Whenever we . . . speak of our company, we consider the consolidated companies of Thunderbird and EVTAC."  AR 587.  Accordingly, the Court will refer to Thunderbird and EVTAC collectively as "EVTAC."

In early 2003, EVTAC suffered a drastic reduction in orders for its taconite pellets. Def.'s SMF ¶ 13.  Rouge Steel began to purchase its taconite from a different company, Cleveland-Cliffs, Inc., while AK Steel began to purchase its ore requirements from Iron Ore Co. of Canada.  Pls.' SMF ¶ 5; Def.'s SMF ¶¶ 4, 13.  Stelco remained under a requirements contract with EVTAC for the first few months of 2003, but that contract expired on May 14, 2003, and was then renewed at a much lower requirement level.  Def.'s SMF ¶ 14; AR 533.

Due to the loss of its biggest purchasers, on February 14, 2003, EVTAC sent a confidential letter to the local USW director advising the Union of its economic prospects.  The letter from EVTAC's Manager of Employee Relations stated:

> Regretfully, I must advise you that it is the intention of the Company to close permanently the Eveleth Mines LLC, dba EVTAC Mining operation. This action results from a lack of customer orders as of this date. The intended closure would commence on or about May 14, 2003. Pellet inventory shipments would be expected to continue past that date and conclude on or about July 12, 2003.

AR 451 (letter from John P. Baxter to David Foster).  The letter invited USW representatives to "discuss the Company's proposed course of action and to provide information to the Company and suggest alternative courses."  AR 451.

On March 10, 2003, EVTAC distributed to its employees a Worker Adjustment and Retraining Notification ("WARN") Act Notice advising them of a planned "Plant Closing or Mass Layoff" around May 15, 2003.[3]  AR 565; Def.'s SMF ¶ 15.  The WARN Notice described the planned shutdown as "temporary (but only if pellet orders are received during shutdown period)."  AR 464, 565; Pls.' SMF ¶ 7; Def.'s SMF ¶ 15-16.

In an effort to secure benefits for its employees, on March 17, 2003, EVTAC sent a

---

[3] The WARN Act requires employers, under certain circumstances, to give at least sixty days advance notice to employees of a forthcoming "plant closing or mass layoff."  29 U.S.C. § 2102(a).

"Petition for Trade Adjustment Assistance" to the United States Department of Labor ("DOL").[4]
Pls.' SMF ¶ 8.  The March 17 petition indicated that the plant would close on May 15, 2003, that
446 employees would be affected, and that job losses were due to the company "losing sales to
customers importing products from a foreign country."  AR 460, 464 (Petition for Trade
Adjustment Assistance).  The petition further stated that the plant "closure will be permanent if
no additional orders are received."  AR 460, 464.  The DOL, however, denied the petition.  AR
465-66 (Letter from John P. Baxter to DOL requesting reconsideration).

### 2.  EVTAC's Bankruptcy and Sale of Assets

On May 1, 2003, EVTAC filed for bankruptcy pursuant to Chapter 11 of the Bankruptcy
Code.  AR 588; Pls.' SMF ¶ 9.  Thunderbird filed for bankruptcy two weeks later on May 15,
2003.  AR 596; Pls.' SMF ¶ 9.  The following day, on May 16, 2003, EVTAC suspended its
mining and taconite production operations and all but four of EVTAC's approximately 400
hourly employees were placed on indefinite temporary layoff.  Pls.' SMF, ¶ 10; AR 455, 458,
540.  These four hourly workers, as well as twenty-nine salaried employees whom EVTAC
continued to employ, were charged with securing the plant site, including welding the plant's
doors and gates shut, turning off the electricity, and disconnecting the batteries on all the
equipment and vehicles.  Pls.' Opp'n, ECF No. 54, at 6 n.3; AR 455, 458-59.  EVTAC also
required the plant's vendors to remove their leased equipment from the plant site and terminated
their leases.  Pls.' SMF ¶¶ 10, 11.

On June 5, 2003, EVTAC requested the DOL to reconsider its earlier denial of EVTAC's

---

[4] The Department of Labor's Trade Adjustment Assistance (TAA) Program is a federal program that provides aid to
U.S. workers who have lost their jobs as a result of foreign trade.  *See Former Employees of Marathon Ashland Pipe
Line LLC v. Chao*, 370 F.3d 1375, 1376 (Fed. Cir. 2004).  A petition must be filed with the DOL by or on behalf of
a group of workers who may have lost or may lose their jobs or experienced a reduction in wages as a result of
foreign trade.  *Id.* If the DOL grants the petitions, those workers may receive TAA benefits, including job training,
job search, and income support.  *Id.*

"Petition for Trade Adjustment Assistance," stating that its circumstances had changed since its March 2003 petition.  AR 465-66; Pls.' SMF ¶ 12.  Specifically, EVTAC stated that "a[t] the time of the initial application, EVTAC Mining was still producing at normal production rates, and Thunderbird employees were still employed.  EVTAC Mining is now totally shut down and only a skeleton crew is employed."  AR 465-66.  EVTAC further stated that AK Steel, one of EVTAC's two primary owners and customers, had not placed new orders, and that "it has also become very clear recently that AK Steel's decision to discontinue purchases from EVTAC Mining is a long term decision." AR 466.  EVTAC noted that AK Steel had begun importing iron ore pellets from Canada, and that those imports had "displaced EVTAC Mining's production." AR 466.

On the basis of the request for reconsideration and an investigation conducted by the DOL starting on June 10, 2003, the DOL found that "increases of imports" of iron ore/taconite pellets had "contributed importantly to the decline in sales or production and to the total or partial separation of workers" at EVTAC, and the DOL granted EVTAC's petition.  Pls.' SMF ¶ 13; TAA Decision 5199.

On June 15, 2003, EVTAC laid off its four remaining hourly production employees, but continued to employ "a skeleton staff" of salaried employees to handle administrative duties and protect against fire and flooding.[5]  Def.'s SMF ¶¶ 27-28; AR 540, 456, 458 (Declarations of former EVTAC employees).  Throughout the bankruptcy proceedings, EVTAC represented to the bankruptcy court that it "continue[d] to maintain the equipment and other assets associated with its mining operations to protect the enterprise value of its estate" while it sought new contracts or a purchaser of its assets or its entire business as a going concern.  Def.'s SMF ¶ 42.

---

[5] According to a news report dated May 15, 2003, EVTAC represented that it would continue to employ approximately 18-20 employees through the shutdown period.  AR 540.

Indeed, EVTAC actively sought new orders for taconite pellets, without success, through July

2003.  AR 9, 449, 647.  On July 5, 2003, for example, EVTAC and USW's representative met

with then-Congressman Jim Oberstar to discuss EVTAC's inability to obtain new sales contracts.

*Id*.  Congressman Oberstar recommended that EVTAC negotiate with Laiwu Steel Group Ltd.

("Laiwu"), a Chinese corporation, either to secure sales contracts with Laiwu or, alternatively,

sell EVTAC's assets.  *Id.*

In early October 2003, five months following the filing of its bankruptcy petition, mining

company Cleveland-Cliffs and Laiwu offered to purchase EVTAC as an operational mining

company.  AR 646-47; Def.'s SMF ¶ 40.  According to news reports, Congressman Oberstar

"helped broker the deal because of his relationship with Yang Jiechi, the Chinese ambassador to

the United States."  AR 647.

On October 20, 2003, EVTAC confirmed the proposed purchase of the mining operations

and filed a motion in bankruptcy court for approval to sell substantially all its assets.  *In re*

*Eveleth Mines LLC*, No. 03-50569 (Bankr. D. Minn. filed October 20, 2003), ECF No. 101.

EVTAC stated in its motion that "[t]he Debtor suspended its mining and taconite production

operations on or about May 16, 2003.  The Debtor continues to maintain the equipment and other

assets associated with its mining operations to protect the enterprise value of its estate while the

Debtor seeks a purchaser and/or funding for a plan of reorganization."  Def.'s SMF ¶ 42; *see also*

Pls.' Opp'n Def.'s Mot. Summ. J., ECF No. 54, at 6.  EVTAC further stated that "[s]ince the

commencement of this Chapter 11 case, the Debtor has proceeded diligently toward the

successful sale of substantially all of its assets (the Mining Assets) on a going-concern basis.  To

date, and although other parties have shown interest, the Buyer . . . is the only interested party

that has come forward to purchase the Mining Assets and execute a letter of intent."  Def.'s

SMF, ¶ 43.  The proposed sale terms required:

> [T]he Debtor to restore its mining operations to operating condition consistent
> with industry practice.  Such work must be commenced immediately in order to
> accommodate the December 1, 2003 closing date . . . .  The work required by this
> condition will return a number of former employees to work and the closing of the
> sale of the Mining Assets . . . will return many more former employees to work.

*In re Eveleth Mines LLC*, No. 03-50569 (Bankr. D. Minn. filed October 20, 2003), ECF No. 101,

at ¶ 15.

On November 16, 2003, the bankruptcy court converted EVTAC's bankruptcy

proceedings from Chapter 11, reorganization, to Chapter 7, liquidation.  AR 4.  Shortly

thereafter, on November 25, 2003, the bankruptcy court approved the sale of all of EVTAC's

operating assets to Cleveland-Cliffs and Laiwu.  AR 5, 640.  According to news reports, during

bankruptcy court proceedings EVTAC's former president testified that the company "had

worked since spring with several interested parties to find a new owner or pellet contracts."  AR

641.

On December 1, 2003, EVTAC closed its transaction with Cleveland-Cliffs and Laiwu,

who named their new joint venture United Taconite LLC.  Pls.' SMF ¶ 27.  United Taconite did

not agree as part of the sale terms to continue the Thunderbird Pension Plan.  Pls.' SMF ¶ 29.

Accordingly, on December 1, 2003, EVTAC and the USW entered into a settlement negotiations

and reached an agreement to terminate their collective bargaining agreement.  AR 612 ¶ 14.G;

Pls.' SMF ¶ 29. Under the settlement agreement, EVTAC permanently laid off its employees,

except three members of management, and United Taconite hired substantially all of these

workers under a new collective bargaining agreement.  AR 610 ¶ 9; Pls.' SMF 28.

### 3.  Pension Benefits Denials

In May 2003, following EVTAC's bankruptcy filing and its decision to place almost all

of its workers on "indefinite temporary layoff," laid off employees began petitioning EVTAC for

shutdown benefits under the Plan, contending that the plant had been permanently shut down. Pls.' SMF ¶ 30; AR 540, 594. In its role as administrator of the Plan, EVTAC denied such benefits because a "permanent shutdown [had] not occurred." Pls.' SMF ¶ 30; AR 530, 595.

After receiving notice of EVTAC's bankruptcy filing, the PBGC began to investigate EVTAC's business prospects and the cost of continuing its pension plan. Pls.' SMF ¶ 23. The PBGC determined that the Plan would be unable to pay benefits when due, and that the PBGC's long run loss would increase unreasonably if the plan were not terminated. AR 520. Specifically, the PBGC determined that the EVTAC shutdown had yet to become permanent and that a permanent shutdown, when it occurred, would increase the Plan's unfunded benefit liabilities by more than $68 million and also increase the Plan's unfunded guaranteed benefits by more than $34 million. AR 534. The PBGC additionally considered that on August 1, 2003, a benefit increase would take effect that would potentially add $1.6 million to the Plan's underfunded guaranteed benefits. *Id.*

In an effort to mitigate these future liabilities, on July 24, 2003, the PBGC filed an action in the United States District Court for the District of Minnesota seeking to involuntarily terminate the Plan, have PBGC appointed as the plan's statutory trustee, and establish July 24, 2003 as the official termination date of the Plan, pursuant to 29 U.S.C. 1342(c). AR 600-01; Pls.' SMF ¶ 24. The USW, however, intervened in that action, arguing that the termination date of July 24, 2003 "would not be in the best interests of the participants of that plan and would be contrary to law." AR 618. In its brief opposing USW's request to intervene, the PBGC stated that the USW sought to contest the July 24, 2003 termination date because it wanted more time to "permit 'shutdown benefits' to accrue," but the court should this reject this argument because the PBGC had a statutorily-sanctioned interest in terminating plans prior to such large increases

in liability.  AR 627.  The PBGC further represented that "recent proceedings relating to the sale of Thunderbird strongly indicate that Thunderbird will be operating again soon, thus precluding the possibility that a permanent shutdown occurred."  AR 627.

Although the USW initially opposed the PBGC's proposed termination date, under the terms of its December 1, 2003 settlement agreement with EVTAC, the USW agreed to "consent to the date of plan termination proposed by PBGC" and withdraw its opposition in the U.S. District Court for the District of Minnesota to set July 24, 2003 as the Plan termination date. Def.'s SMF ¶ 38; AR 597, 602-09.  In accordance with the settlement agreement, on May 10, 2004, the USW represented to the district court that it "did not oppose" PGBG's motion to set July 24, 2003 as the termination date of the Thunderbird Plan.  AR 597.   Accordingly, on August 19, 2004, the district court granted PBGC's motion, declared PBGC the plan's statutory trustee, and set July 24, 2003 as the date on which the Plan terminated.  AR 505.

Subsequent to the Plan's termination, between December 21, 2006, and May 15, 2007, PBGC's administrative determinations governed participant benefits.  AR 467.  During this period, approximately 240 former EVTAC employees applied for shutdown benefits pursuant to the Plan, which the PBGC denied.  AR 5-6, 369, 473.  On May 31, 2007, the USW filed an administrative appeal of those decisions on behalf of the participants who were denied shutdown benefits, arguing that EVTAC was permanently shut down prior to the Plan's termination date of July 24, 2003 and the former employees' continuous service was broken due to the permanent shut down.  Pls.' SMF ¶ 32, AR 6.  On November 30, 2007, the PBGC Appeals Board issued a final agency decision, upholding the PBGC's denial of benefits and stating that the "PBGC is unable to guarantee shutdown benefits . . . because Thunderbird was not permanently shut down before the Plan was terminated on July 24, 2003."  AR 2-17.

### C.  Procedural History

On June 17, 2008, the USW filed a Complaint in the U.S. District Court for the District of Minnesota on behalf of former Thunderbird employees[6] against the PBGC seeking declaratory judgment that the plan participants are entitled to shutdown benefits, enforcement of employees' rights under the plan, and damages.  Am. Compl., ECF No. 13, ¶¶ 21-25.  In response to the Complaint, the PBGC moved to dismiss the action for improper venue pursuant to FED. R. CIV. P. 12(b)(3), or, in the alternative, to transfer venue to the District of Columbia. ECF No 8.  On March 29, 2009, the District Court for the District of Minnesota denied the PBGC's motion to dismiss, but granted its motion to transfer venue and transferred the instant lawsuit to this Court.  ECF No. 23.

On September 15, 2009, the PBGC moved for summary judgment based on the administrative record,[7] arguing that it was entitled to judgment as a matter of law because the administrative determinations at issue in this case were not arbitrary or capricious, or otherwise not in accordance with law.  Def.'s Mot. Summ. J., ECF No. 51.  The plaintiffs filed a cross-motion moving for summary judgment on the issue of liability, contending that the PBGC is obligated to guarantee the payment of shutdown benefits under the Plan.  Pls.' Mot. Summ. J., ECF 52.  Both of these motions are pending before the Court.[8]

As explained below, the PBGC's determination that the Thunderbird facility did not permanently shut down prior to the plan's termination date of July 24, 2003, is supported by

---

[6] The USW initially filed suit on behalf of 253 former Thunderbird employees. On November 4, 2008, USW filed an amended complaint adding eleven individually named plaintiffs.  ECF No. 13.

[7] The parties agree that the administrative record here consists of nearly six-hundred and fifty pages, including the PBGC Appeals Board decision, the terms of the Thunderbird Pension Plans, participant appeals documents, and plan termination documents, as well as contemporaneous correspondence, emails and memoranda between EVTAC, the USW, and the PBGC.  *See* ECF No. 32-46.

[8] This case was transferred to the current presiding Judge on January 21, 2011.

sufficient evidence in the Administrative Record.  Accordingly, the defendant's motion for

summary judgment is GRANTED and the plaintiffs' motion for summary judgment on liability

is DENIED.[9]

## II.    STANDARD OF REVIEW

### A.  Review of PBGC Administrative Determinations Under 29 U.S.C. § 1303(f)

Plaintiffs seek review of the PBGC's denial of their applications for "shutdown benefits"

pursuant to 29 U.S.C. § 1303(f), which provides, in relevant part, that "any . . . participant, or

beneficiary, [who] is adversely affected by any action of [PBGC] with respect to a plan in which

such person has an interest . . . may bring an action against the corporation for appropriate

equitable relief in the appropriate court."  29 U.S.C. § 1303(f)(1).  While Section 1303(f) allows

plaintiffs to assert their claim in federal court, it does not specifically identify an appropriate

standard of judicial review for the PBGC's decision.

The PBGC, however, is a federal agency subject to the provisions of the Administrative

Procedure Act ("APA").  5 U.S.C. §§ 551 *et seq.*  Pursuant to the APA, courts generally must

defer to agency actions, including informal agency adjudications, unless the plaintiff

demonstrates that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with the law."  5 U.S.C. §§ 555, 706(2)(A).

The plaintiffs argue that "[t]he D.C. Circuit has not addressed the appropriate standard of

review" to be applied to the specific PBGC determination at issue in this case, namely whether a

"permanent shutdown" of the Thunderbird plant occurred prior to the date of plan termination.

Pls.' Mot. Summ. J., ECF No. 52, at 11.  According to the plaintiffs, the appropriate standard of

---

[9] Pursuant to Local Civil Rule 7(f), the plaintiffs requested oral argument on the instant motions.  The local rule provides that the allowance of oral argument "shall be within the discretion of the court."  LCvR 7(f).  The Court agrees with the defendant that "the issue in this case is straightforward and has been fully briefed by the parties, and that oral argument would not be particularly useful to the Court in rendering its decision."  Defs.' Opp'n Pls.' Mot. Summ. J., ECF No. 53, at 15.  Accordingly, the plaintiffs' request for oral argument is denied.

review of the PBGC's denial of benefits in this case is *de novo* and the agency is not entitled to deference under the APA.  This is incorrect.

### 1.  *De Novo* Judicial Review Is Not Appropriate In This Case

In support of its contention that *de novo* review is appropriate, the plaintiffs rely primarily on *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) and *Dycus v. Pension Benefit Guar. Corp.*, 133 F.3d 1367 (10th Cir. 1998).  According to the plaintiffs, "[u]nder *Dycus*'s rationale, the appropriate standard of review of the PBGC's determination in this case is *de novo*."  Pls.' Mot. Summ. J., ECF No. 52, at 11.  Neither *Firestone* nor *Dycus*, however, provide dispositive support for the plaintiffs' position.

In *Firestone,* the Supreme Court addressed the appropriate standard of judicial review under ERISA for benefit determinations made by fiduciaries or plan administrators.  489 U.S. at 105.  Plaintiffs were six employees who sought benefits under an ERISA covered plan after the plant in which they worked was sold by Firestone as a going concern to another company.[10]  *Id.* The employees alleged, *inter alia*, that they were entitled to severance benefits under the provisions of their pension plan because the sale of their plant constituted a "reduction in work force."  *Id.* at 106.  After Firestone denied their application for benefits, the plaintiffs initiated an action pursuant to 29 U.S.C. § 1132(a)(1)(B), which provides that a "civil action may be brought . . . by a participant or beneficiary [of a covered plan] . . . to recover benefits due to him under the terms of his plan . . . ."

The Supreme Court addressed the standard of judicial review for cases challenging denial of benefits pursuant to § 1132(a)(1)(B), stating:

> Consistent with established principles of trust law, we hold that a denial of
> benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo*

---

[10] The Supreme Court noted that following the sale of the plant in which they worked, the employees in *Firestone* "continued in their same positions without interruption and at the same rates of pay."  *Firestone*, 489 U.S. at 105.

standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

489 U.S. at 115.  In situations where the plan provides the administrator or fiduciary discretion to determine benefits, the Court stated that deferential review is appropriate.  *Id.* at 111; *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (reaffirming the standard set forth in *Firestone* for actions under § 1132(a)(1)(B)).  The Court explicitly noted, however, that its holding "is limited to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations" and "express[ed] no view as to the appropriate standard of review for actions under other remedial provisions of ERISA."  *Firestone*, 489 U.S. at 108.

This express limitation of the standard of review to actions brought pursuant to § 1132(a)(1)(B) is not addressed by the plaintiffs who instead seek to stretch the holding to cover actions, such as the instant lawsuit, brought challenging PBGC administrative decisions under a different ERISA subchapter, namely § 1303(f).  The plaintiffs' reading of *Firestone*, which involved review of a private employer's administration of an ERISA plan and that employer's denial of benefits, to apply to the PBGC creates a tension between the standards of review under the APA with that set forth in *Firestone*.

The plaintiffs urge the Court to reconcile this tension by reading *Firestone* to trump any contrary standard of review that may be required by the APA.  They rely on the Tenth Circuit's decision in *Dycus* as support for the proposition that *de novo* review is appropriate.  In *Dycus*, the PBGC assumed administration of certain pension plans after the company administering the plans became insolvent.  133 F.3d at 1368.  Former employees of the company applied for benefits under one of the plans, which the PBGC, acting as administrator of the plan, denied after concluding that a "permanent shutdown" had not occurred.  *Id.* at 1368-69.

The plaintiffs in *Dycus* unsuccessfully challenged the PBGC's denial of benefits in district court pursuant to § 1303(f). *Id.* On appeal, the Tenth Circuit affirmed the PBGC's determination that a "permanent shutdown" of the company's mine had not occurred and its decision to deny certain benefits to plan participants. In setting forth the appropriate standard of judicial review, the Tenth Circuit emphasized that the PBGC is an administrative agency and its decisions "must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 1369. Notwithstanding the Court's reference to the APA standard of review, the Court then acknowledged that this standard of review was consistent with *Firestone*, stating:

> The challenged agency action involves construction of the terms of a pension plan, which we generally review de novo. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). But if a pension plan itself "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," *id.* at 115, the administrator's or fiduciary's decision is entitled to review under the deferential arbitrary and capricious standard.

> Here the plan administrator . . . had authority to decide all questions concerning the application or interpretation of the provisions of the [p]lan. When the PBGC took over the plan as statutory trustee, it had authority to "do any act authorized by the plan . . . to be done by the plan administrator or any trustee of the plan." 29 U.S.C. § 1342(d)(1)(A)(i). Thus the district court correctly determined that the decisions of the PBGC were entitled to deferential review under both the APA and *Firestone.*

*Id.* Thus, the Tenth Circuit recognized the potential tension between *Firestone* and the APA, but was able to reconcile the two in that case because the plan at issue fit within the *Firestone* exception to *de novo* review.

The plaintiffs would like to read more into the Tenth Circuit's statements in *Dycus*. They contend that the Tenth Circuit applied the *Firestone* standard to the PBGC's administrative

action and only deferred to the PBGC because the plan at issue gave the administrator

discretionary authority, which the Thunderbird Plan does not provide to the PBGC in this case.

*See Firestone*, 489 U.S. at 115 (stating that de novo review is appropriate "unless the benefit

plan gives the administrator or fiduciary discretionary authority to determine eligibility for

benefits or to construe the terms of the plan.").  The plaintiffs' reading of *Dycus* and its

understanding of *Firestone* is incorrect.  While the Tenth Circuit discussed *Firestone* and the

deference accorded to the administrator by the terms of the pension plan, the Court did not, as

the plaintiff argues, disregard the APA.  To the contrary, the Court stated that decisions of the

PBGC "were entitled to deferential review under *both* the APA and *Firestone*."  *Dycus*, 133 F.3d

at 1369 (emphasis added).

      Aside from *Dycus*, the plaintiff cites no other case in support of its position that the

PBGC should not be accorded deference under the APA in actions pursuant to § 1303(f).  Like

the Tenth Circuit, this Court concludes that deference to the PBGC under the APA is appropriate

given the agency's specialized role in the administration and protection of pension benefits for

this country's workers.  It is true that the PBGC's "dual role of trustee and guarantor . . .

undoubtedly has some built-in potential for a conflict of interest."  *Piech v. Pension Ben. Guar.*

*Corp.*, 744 F.2d 156, 161 (D.C. Cir. 1984) (stating that the PBGC's dual role may "give rise to a

conflict of interest leading to a breach of the fiduciary obligations of a plan trustee"); *see also Glenn*,

554 U.S. at 115 (holding that courts should consider, under § 1132(a)(1)(B), the conflict of

interest arising from an entity's dual role as an ERISA plan administrator and payer of plan

benefits as a factor in determining whether the plan administrator has abused its discretion in

denying benefits); *Firestone*, 489 U.S. at 115 ("[I]f a benefit plan gives discretion to an

administrator or fiduciary who is operating under a conflict of interest, that conflict must be

weighed as a factor in determining whether there is an abuse of discretion.").  Nevertheless, Congress not only expressly authorized the PBGC to assume a dual role as trustee and guarantor, but also provided for involuntary termination proceedings under ERISA "precisely so that [the] PBGC can protect its own financial interests and 'avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund.'" *Republic Tech. Int'l*, 386 F.3d at 668 (quoting 29 U.S.C. § 1342(c)).  While the potential conflict arising from the PBGC's dual role may certainly be relevant in some circumstances, the Court is cognizant of the agency's unique role in regulating ERISA and its interest in maintaining financial stability so that it may continue to safeguard and insure benefits for employees across the county.[11]

As explained above, the plaintiffs' assertion that *Firestone* and *Dycus* support *de novo* review of the PBGC's actions in this case is erroneous.  Courts have consistently applied the deferential APA standard of review to PBGC actions under § 1303(f).  *See, e.g.*, *Sara Lee Corp. v Am. Bakers Ass'n Retirement Plan*, 512 F. Supp. 2d 32, 37 (D.D.C. 2007) (rejecting assertion that *de novo* review applies to actions under § 1303(f) and applying deferential review pursuant to the APA); *Montgomery v. Pension Benefit Guar. Corp.*, 601 F. Supp. 2d 139, 141-42 (D.D.C. 2009) (applying deferential review under the APA to legal challenge filed pursuant to § 1303(f)).[12]  In fact, the plaintiffs' specific argument that *Firestone* should be applied to the

---

[11] The PBGC receives no funds from general tax revenues.  *See Republic Tech. Int'l*, 386 F.3d at 661.  The agency finances its operations "using income from four basic sources: (1) insurance premiums set by Congress and paid by sponsors of defined benefit plans, (2) investment income, (3) assets in terminated plans, and (4) recoveries, if any, from employers whose underfunded plans have terminated."  *Id.*; *see also* 29 U.S.C. §§ 1302(g)(2), 1306, 1362.

[12] The plaintiffs argue that *Montgomery v. PBGC* supports their position that *de novo* review should apply despite the fact that *Montgomery* applied deferential judicial review pursuant to the APA.  Specifically, the plaintiffs state that "[a]fter stating the general standard of review applicable in APA cases . . . the Court went on to apply what amounts to a thorough *de novo* review of the agency's decision" and "carefully examined the plan terms in question."  Pls.' Reply, ECF No. 55, at 8.  This argument is meritless.  That court explicitly stated that the APA required judicial deference to agency actions and its detailed explanation as to why the agency in that case was

PBGC was recently raised and denied by another court in this jurisdiction.

In *Davis v. PBGC*, Judge Kennedy rejected the plaintiff's assertion that "the trust law principles applied by the Supreme Court in *Firestone* . . . apply equally to the PBGC." *Davis v. Pension Benefit Guar. Corp.*, No. 08-cv-1064, 2011 WL 4536888, at *2 n.2 (D.D.C. Sept. 30, 2011). The court recognized that *Firestone* was limited to actions under § 1132(a)(1)(B) and "is not binding" in cases under § 1303(f). Accordingly, the court concluded that there was "no other avenue to avoid the default presumption that federal agency actions are, where the governing statute is silent, reviewed pursuant to the APA." *Id.*; *see also Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496 (2004) ("Because the Act itself does not specify a standard for judicial review in this instance, we apply the familiar default standard of the Administrative Procedure Act and ask whether the Agency's action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"). Just as in *Davis*, this Court sees no basis to depart from the default presumption that the PBGC is entitled deference pursuant to the APA.[13]

### 2. Arbitrary and Capricious Review Pursuant To The APA

Pursuant to the APA, courts may only set aside agency actions, including those of the PBGC, that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Sara Lee Corp.*, 512 F. Supp. 2d at 37. In evaluating agency actions under this standard, courts must consider "whether the [agency's]

---

correct should not be construed to imply that the PBGC is held to a higher standard of review.

[13] The plaintiffs argue that the PBGC must administer the plan in accordance with its terms and here the specific contract term at issue is ambiguous because the Plan does not define "permanent shutdown." Pls.' Mot. Summ. J., ECF No. 52, at 14. According to the plaintiff, the PBGC was incorrect as a matter of contract interpretation, which is a legal, not factual, determination that the Court must review *de novo*. *Id.* The plaintiffs are correct that while an agency is provided deference in the interpretation of its own statute, it is not provided deference in matters of contract interpretation. *See* Pls.' Reply, ECF No. 55, at 3-4. Here, however, whether a "permanent shutdown" occurred prior to the Plan's termination date is primarily a factual question, which is within the agency's expertise to determine after review of relevant facts and circumstances of the shutdown.

decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotations and citation omitted); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997).   The scope of the Court's review under this standard "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).

The Court starts with the assumption that the agency action is valid.   *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).   If an agency, however, "failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action."   *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999).   At the very least, the agency must have reviewed relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (internal quotations omitted); *see also Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). Agency actions are considered arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43.   While the agency's explanation cannot "run [ ] counter to the evidence," *id.,* courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."   *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).   Furthermore, where an agency has acted in an area in

which it has special expertise, the court must be particularly deferential to the agency's

determinations.  *Sara Lee Corp*., 512 F. Supp. 2d at 37.  At the same time, the Court is mindful

of the PBGC's special fiduciary role as administrator of the plan at issue.  *See Piech*, 744 F.2d at

161 (recognizing that the PBGC's dual role as guarantor and trustee may "give rise to a conflict of

interest leading to a breach of the fiduciary obligations of a plan trustee").

      In actions under the APA, summary judgment is the appropriate mechanism for

"deciding, as a matter of law, whether the agency action is supported by the administrative

record and otherwise consistent with the APA standard of review."  *Oceana, Inc. v. Locke*, No.

10-cv-744, 2011 WL 6357795, at *8 (D.D.C. Dec. 20, 2011) (citing to *Richard v. INS*, 554 F.2d

1173, 1177 (D.C. Cir. 1977)).  "In such cases, a federal district court sits as an appellate tribunal

to review the purely legal question of whether the agency acted in an arbitrary and capricious

manner."  *Franks v. Salazar*, No. 09-cv-942, 2011 WL 4600723, at *4 (D.D.C. Oct. 6, 2011)

(citing *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  Judicial

review is limited to the administrative record, and the burden is on the plaintiff to prove how the

decision was arbitrary and capricious.  *Id*.

### B.  Summary Judgment

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be

granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Anderson v. Liberty

Lobby*, 477 U.S. 242, 247 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Summary

judgment is properly granted against a party who "after adequate time for discovery and upon

motion . . . fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986).  The burden is on the moving party to demonstrate that there

is an "absence of a genuine issue of material fact" in dispute. *Celotex Corp.*, 477 U.S. at 323.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in favor of the nonmoving party, and shall accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255; *Tao*, 27 F.3d at 638. The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3). The nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 255, and cannot simply rely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* If the evidence "is merely colorable, or not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

## III.    DISCUSSION

The plaintiffs contend that the PBGC erroneously denied "shutdown benefits" to former EVTAC employees, a determination that "rests squarely on the conclusion that the EVTAC plant was not permanently shut down by the Company prior to the plan termination date of July 24, 2003." Pls.' Mot. Summ. J., ECF No. 52, at 14. As explained above, the Court must defer to the PBGC so long as its decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Dycus*, 133 F.3d at 1370. Upon review of the administrative record, the Court concludes that the PBGC's determination that the EVTAC facility did not undergo a "permanent shutdown" prior to the plan termination date is sufficiently supported by evidence in the record.

### A.  The PBGC's Decision is Supported by EVTAC's Public and Private Representations That a Permanent Shutdown Had Not Occurred

The Thunderbird Plan provides for shutdown benefits when there is a "permanent

shutdown," but does not define or specify when a "permanent shutdown" occurs.  PBGC policy states that when the agency is confronted with applications for shutdown benefits, it will "scrutinize shutdown benefits and make case-by-case determinations of whether facility shutdowns have occurred.  The purpose of these determinations is to ensure that shutdown benefits are not paid when employment has continued, even if that employment is with a new employer."  AR 659 (PBGC Operating Policy Manual).  The PBGC further states that it "will pay shutdown benefits only if it determines that a shutdown has occurred . . . . A determination of whether a shutdown has occurred will be based on whether or not substantially all of the employer's operations have ceased, resulting in a loss of jobs that is expected to be permanent for all or substantially all of the employees at that facility who are participants in the plan.  The sale of an employer's assets does not automatically constitute a shutdown."  AR 660(PBGC Operating Policy Manual).  In determining whether a permanent shutdown had occurred  prior to the Plan's termination date, the PBGC Appeals Board methodically reviewed in chronological order the representations made by EVTAC publicly to its workers and in judicial proceedings, as well as privately to the PBGC.  In doing so, the Appeals Board also evaluated the plaintiffs' interpretations of those same representations as a basis for the plaintiffs' assertions that EVTAC permanently shut down its plant on May 15, 2003.

First, the PBGC Appeals Board addressed the plaintiffs' assertion that "management's written statements indicate its intent to permanently close the plant if no additional orders were received."  AR 8.  Specifically, EVTAC's March 2003 WARN Act Notice to employees advised that the plant was to be "temporarily" shutdown, unless new orders were received during the "shutdown period."  *See* Def.'s Mot. Summ. J., ECF No. 51, at 7; AR 463, 565.  The Appeals Board noted the "clear" indication that the shutdown was "temporary," and of "indefinite

duration" because EVTAC was uncertain "when it might receive" new orders and "did not want

to limit its options by specifying an end date that was too early."  AR 8-9.  In short, even though

EVTAC did not obtain new orders from March to July 24, 2003, EVTAC believed that it had not

permanently shut down and was continuing to seek new orders and buyers and had not decided

to liquidate its assets permanently.

In support of this conclusion, the record indicates that in early June 2003, EVTAC was

communicating with the PBGC and informed the agency that 300 hourly workers had applied for

shutdown benefits in May 2003, but the company had denied those benefits because "there is a

glimmer of hope [EVTAC] can survive." AR 583 (Email from Gadre Ajit describing June 6,

2003 phone conversation with EVTAC representatives).  EVTAC further informed the PBGC

that the USW was "pressuring the company to declare a permanent shutdown" but that it had "so

far resisted."  *Id.*  EVTAC believed that it would decide by "Aug 1" whether to reorganize or

"liquidate (i.e. the date it may declare permanent shutdown)" and there was "hope that the

Chinese will want to buy pellets" and "[Cleveland]-Cliffs may want to buy EVTAC too."  AR

584.

Second, in making its decision, the PBGC Appeals Board relied upon EVTAC's

representations regarding its efforts to find new contracts and buyers through July 2003.  The

record indicates that EVTAC met with Congressman Oberstar on July 5, 2003, who then began

facilitating conversations with Chinese steelmakers and potential buyers.  EVTAC's

representations that it hoped to sell the company and that it was negotiating with potential buyers

are corroborated by the fact that it did, in fact, reach an agreement to sell the EVTAC facility

merely three months later in October 2003.  In its motion to approve the asset sale in the

bankruptcy court, EVTAC stated it had "suspended its mining and taconite production operations

on or about May 16, 2003" and was continuing "to maintain the equipment and other assets

associated with its mining operations to protect the enterprise value of its estate while

[Thunderbird sought] a purchaser and/or funding for a plan of reorganization."  AR 646-47; *see

also* Def.'s Mot. Summ. J., ECF No. 51, at 10.

EVTAC's public and private representations that a permanent shutdown had not occurred

as of July 24, 2003, as well as evidence of its efforts to find new buyers to resuscitate its

operations, provide sufficient support for PBGC's conclusion that the shutdown was not

permanent as of July 2003.  This Court is cognizant, as was the PBGC Appeals Board, however,

that in February 2003, prior to the events described above, EVTAC informed USW

representatives in a confidential letter that the plant would likely "close permanently," and

EVTAC's June 2003 request to the DOL to reconsider Trade Adjustment Assistance described

the plant as "totally shutdown."  The Court agrees with the plaintiffs, however, that "actions

speak louder than words."  Pls.' Mot. Summ. J., ECF No. 52, at 15.  These two representations

do not sufficiently undermine other facts in the record, including evidence of EVTAC's efforts,

which were ultimately successful, of selling its operations as a going concern.

### B.  Objective Facts Further Support PBGC's Determination That a Permanent Shutdown Did Not Occur

The plaintiffs contend that because the Thunderbird Plan did not specifically define

"permanent shutdown," the Court should look to arbitration decisions for "a coherent and

persuasive body of authority interpreting 'shutdown benefit' provisions."  Pls.' Mot. Summ. J.,

ECF No. 52, at 14.  According to the plaintiffs, arbitration decisions indicate that the appropriate

inquiry to determine whether a permanent shutdown occurs involves assessing "objective facts"

and whether the company "abandoned all 'reasonable hope' of resuming operations."[14]  *Id.* at 15-16.

As an initial matter, the Court rejects the suggestion that arbitral decisions control the Court's analysis of whether the PBGC's action was arbitrary or capricious.  As the defendant notes, "[s]ince the sole question is whether there was a rational connection between the facts found and the decision PBGC made, the arbitral decisions are not binding, or even persuasive, authority in challenging PBGC's benefit determinations."  Def.'s Opp'n Pls.' Mot. Summ. J, ECF No. 53, at 11.  In any event, the PBGC Appeals Board stated that it "considered all of the material [] submitted in connection with [the plaintiffs'] appeal, including the arbitral decisions cited in [the plaintiffs'] brief."  AR 6.

The plaintiffs argue that the PBGC's determination that the plant was not permanently shutdown was erroneous because it looked to the company's "statements and subjective beliefs," and ignored "objective facts."  Pls.' Opp'n Def.'s Mot. Summ. J., ECF No. 54, at 8-9.  The plaintiffs contend that "the 'objective facts' in the record readily demonstrate that, as of the Plan termination date of July 24, 2003, the Company had indeed 'thrown in the towel' in the decisive sense that it harbored no 'reasonable hope' of resuming its operations at the EVTAC plant."  Pls.' Mot. Summ. J., ECF No. 52, at 18.  Putting aside EVTAC's representations, however, the administrative record contains sufficient evidence to support the PBGC's conclusion that EVTAC did not permanently shut down.

The plaintiffs primarily assert that "EVTAC's decision *not* to maintain the plant and its equipment in 'standby' condition – as EVTAC consistently had done in the past in the case of *temporary* shutdowns – speaks volumes and leads ineluctably to the conclusion that in *this*

---

[14] The arbitral decisions the plaintiffs cite do not involve the PBGC and, in any event, were not binding on the PBGC's Appeals Board.  AR 8.

instance, EVTAC's closure of the plant was intended to be *permanent*."  *Id.* at 19.  Plaintiffs

contend that when the EVTAC plant was temporarily shut down in the past, "15 to 20 hourly

employees" continued to be employed to protect equipment from damage and disuse, and

vendors left their equipment at the plant site.  By contrast, in this instance, employees were

instructed to weld shut the gates and doors of the plant, the vendors' leases were terminated and

their equipment removed, and there were no hourly employees to perform intermittent inspection

of the plant equipment.

The plaintiffs are correct that the 2003 shutdown differed from temporary shutdowns that

had occurred in the past.  Nonetheless, this evidence does not conclusively establish that the

shutdown was permanent.  In *Coleman v. PBGC*, No. 99-cv-278, 2005 WL 5534139 (D.D.C.

2005), for example, the court concluded that although there was "a complete shutdown of the

entire plant" and employees were laid off months prior to the plant closing date, "[i]t does not

follow . . . that a production shutdown necessarily constituted a *permanent* shutdown of []

plants." *Id.* at *11.  That court specifically concluded that the "PBGC relied on the Union's and

[company's] representations [regarding when the plant closure was permanent], and such

reliance was not unreasonable." *Id.* at *10.

In this case, EVTAC's shutdown and specifically its departure from previous practice

also does not necessarily imply that the EVTAC plant was permanently shut down, nor did the

PBGC fail to consider the specific circumstances of EVTAC's May 2003 closure.  The PBGC

recognized and "agree[d]" that EVTAC "did not anticipate reopening the plant within a matter of

weeks after the temporary closure began."  AR 10.  Nevertheless, the PBGC concluded that "a

failure [to place the plant on standby] would [not] foreclose any reasonable likelihood of

resuming operations."  AR 9.  This determination is supported by the record, which establishes

that EVTAC did in fact resume production in late 2003 as required by the terms of transaction

between EVTAC and Cleveland-Cliffs/Laiwu.

Other objective facts in the record provide a sufficient basis for the PBGC's conclusion

that a permanent shutdown had not occurred.  As previously noted, EVTAC's March 10, 2003

notice described the planned shutdown as "temporary."  AR 464-65.  A similar description was

used two months later, in May 2003, when EVTAC initiated bankruptcy proceedings under

Chapter 11 seeking to reorganize or sell the company and placed nearly all of its workers on

"indefinite *temporary* layoff."  AR 540 (emphasis added).  In May and June, EVTAC denied

"shutdown benefits" to these employees upon its conclusion that the shutdown was not

permanent.  Moreover, the record indicates that EVTAC continued to seek new orders, meeting

with potential buyers through and past the July 24, 2003 termination date.  EVTAC's actions

prior to the July 24, 2003 date adequately support the PBGC's conclusion that EVTAC still

intended to revive and renew its operations and that the shutdown had yet to become permanent.

Finally, the procedural history of this matter lends further support for the PBGC's

conclusion that no permanent shutdown of EVTAC occurred prior to the July 24, 2003

termination date.  PBGC moved to terminate the Plan on July 24, 2003, before, in its view,

EVTAC's shutdown became permanent, which would have triggered the vesting of shutdown

benefits and the resulting increase in unfunded liabilities for the agency.  In particular, the PBGC

Appeals Board thoroughly considered the plaintiffs' assertion that by the time of the Plan's

termination, the PBGC had determined that "EVTAC was not viable and that there was no

reasonable expectation that the facility would resume operations."  AR 10.  The Appeals Board

discussed internal PBGC documents relied upon by the plaintiffs for its conclusion that the

PBGC knew the plant had permanently ceased operations by July 24, 2003.  Contrary to the

plaintiffs' conclusion, the Appeals Board determined that these internal documents showed the termination date was set while the plant was merely in temporary shutdown and even though EVTAC "continued seeking pellet contracts," in order to avoid "additional underfunding that would result from a permanent shutdown . . . ."  AR 10-11.

USW understood the timing of the PBGC's action and the reason underlying its proposed termination date of July 24, 2003.  The USW intervened in the proceeding before the U.S. District Court for the District of Minnesota in order to contest the July 24, 2003 date as "not in the best interests of participants of [the] plan."  AR 618.  As part of a negotiated deal, however, the USW ultimately agreed to the July 24, 2003 termination date, and represented to the district court that it "did not oppose" the PBGC's motion.  AR 505-06; 597, 609-14.

### C.  The PBGC Did Not Err When Considering EVTAC's Transaction with Cleveland-Cliffs and Laiwu

The plaintiffs additionally contend that the PBGC erred in its determination that the EVTAC plant was not permanently shut down because it improperly considered EVTAC's eventual sale of the plant.  According to the plaintiffs, "relevant case law and the PBGC's own policy statement on shutdown benefits establish that the right of pension plan participants to receive shutdown benefits when *their employer* permanently ceases *its* operations at a plant *it* owns is not negated by the employer's subsequent sale of its assets to an unrelated entity that initiates operations anew at the plant but does not adopt or continue the employer's pension plan."  Pls.' Opp'n Def.'s Mot. Summ. J., ECF No. 55, at 11.

In support of this position, the plaintiffs rely on *Thorpe v. Retirement Plan of the Pillsbury Co.*, 80 F.3d 439 (10th Cir. 1996), but this reliance is misplaced.  In *Thorpe*, the plaintiff challenged his previous employer's denial of early retirement benefits, which he argued were triggered by "plant closure."  The plant in which the plaintiff worked "discontinued its

operations . . . and laid off its employees." *Id.* at 442. That same day, a new employer "took

over operation of the facility, answering phones, accepting deliveries and hiring new

employees," and also re-hired the plaintiff. *Id.* Production at the facility began the following

day. While the new employer continued, almost without interruption, production at the plant, the

purchase agreement between the two companies did not provide for assumption of the previous

employer's collective bargaining agreement with its workers; did not require the new company

to hire old employees or to continue their terms and conditions of employment; and did not

transfer the liabilities associated with the previous pension and welfare plans. *Id.* at 443-44.

On these facts, the Tenth Circuit held that the plant in which the plaintiff worked had

closed within the meaning of the pension plan and the plaintiff was entitled to early retirement

benefits. The court stated that it was "precisely the alteration in the rights and responsibilities of

Defendants that makes it clear that the [] plant closed" and that the plan's "contractual liabilities

did not evaporate" when the plant was sold to "a buyer who specifically refused to assume such

liabilities." *Id.* at 444; *cf. Dycus*, 133 F.3d at 1371-72 (affirming PBGC's determination that a

"permanent shutdown" did not occur in part because plaintiffs' new employer assumed

responsibility for the existing pension plans).

The plaintiffs in this case argue that "[t]he reasoning and the holding of the Tenth Circuit

in *Thorpe* apply with full force here. Like the purchaser of the employer's assets in *Thorpe*, the

purchaser of EVTAC's assets in this case – United Taconite – did *not*, insofar as the record

shows, agree to assume EVTAC's contractual liabilities under the terms of the Thunderbird

Pension Plan." Pls.' Mot. Summ. J., ECF No. 52, at 22-23. While as a factual matter the

plaintiffs are correct, they misunderstand the question before the Court. As the defendant

explains, the question in *Thorpe* was "whether there had been a shutdown at all on the *date of the*

*sale*, not whether there had earlier been a 'permanent shutdown.' Here, whether the purchaser later assumed the Pension Plan has no relevance." Def.'s Reply, ECF No. 57, at 4.

To elaborate, the Thunderbird Plan terminated on July 24, 2003, well prior to the date Cleveland-Cliffs and Laiwu purchased the EVTAC facility as a going concern. Consequently, the question before the Court is not whether United Taconite assumed the pension plan for the former EVTAC workers, but whether there is evidence in the record sufficient to support the PBGC's determination that prior to July 24, 2003, EVTAC had not permanently shut down its operations. As discussed above, the record indicates that EVTAC not only sought to sell its operations as a going concern, but was also seeking new orders that would allow it to continue to operate. In its July 5, 2003 meeting with Congressman Oberstar, for example, the record indicates that EVTAC discussed the possibility of obtaining sales contracts with Chinese manufacturers. EVTAC further represented to the PBGC during that time that there was "hope that the Chinese will want to buy pellets." AR 584. The fact that United Taconite did not assume the Thunderbird Plan when it ultimately purchased EVTAC's operations does not negate the fact that evidence supports the PBGC's conclusion that prior to July 24, 2003, EVTAC had not permanently shut down its plant and believed that it could resume operations.

The PBGC's determination that the EVTAC plant had not permanently shut down prior to July 24, 2003 is supported by the record before the Court and is rationally connected to the facts in this case. The PBGC's denial of shutdown benefits to former EVTAC employees was thus not arbitrary or capricious.

## IV.   CONCLUSION

As explained above, the plaintiffs have failed to demonstrate that the PBGC's denial of shutdown benefits to former Thunderbird employees was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.  Accordingly, the defendant's motion for

summary judgment is GRANTED and the plaintiffs' motion for summary judgment on liability

is DENIED.

**DATE: MARCH 20, 2012**                              /s/ *Beryl A. Howell*

                                                     BERYL A. HOWELL
                                                     United States District Judge